DECLARATION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since June of 2014. I received initial training and instruction to become a Special Agent at the FBI Academy located in Quantico, Virginia, in January of 2020 which included training concerning violations of the United States criminal statutes. I am currently assigned to the Richmond Division of the FBI, Roanoke Resident Agency. I am presently, and have been previously, assigned to investigate a variety of criminal and national security matters, to include violent crimes, complex financial crimes, healthcare fraud, and counter-intelligence investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause. While serving within my capacity at the FBI, I have authored search warrants concerning various federal criminal violations.

2. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other agents and police officers involved in this investigation. All observations referenced below that were not personally made by me were relayed to me by persons who made such observations, or they were garnered through my review of records, documents, and other evidence obtained during the course of this investigation.

3. This affidavit contains information necessary to support a civil complaint for forfeiture in rem of approximately $601,668.98, $66,852.11, and $4,061.72, totaling approximately $672,582.81 in U.S. currency (collectively, the "SALE PROCEEDS") representing the net proceeds of the sale of 6768 Christopher Drive, Roanoke, Virginia (the PREMISES). I submit that the SALE PROCEEDS constitute proceeds traceable to violations of 18 U.S.C. §§ 1343 and/or 1349, and/or are involved in money laundering in violation of 18 U.S.C. §§ 1956 and/or 1957 and therefore are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), and/or (C).

4. On February 6, 2024, at approximately 8:00 p.m., Diane Earls advised police in Salem, Virginia, that her husband, Robert Earls, Jr., had been missing since approximately 10:00 a.m. Diane Earls advised that she pinged Robert's phone in the vicinity of Lewis Gale Hospital in Salem, Virginia, and noted that he had no reason to be there. On February 7, 2024, Diane Earls notified the Salem Police Department that she had located Robert's car at Lewis Gale, and it contained a concerning note inside. A second search of Lewis Gale Hospital resulted in Robert Earls' body being located in a locked bathroom with what appeared to be a self-inflicted gunshot to his head.

5. Salem police conducted a death notification to Diane Earls at the PREMISES. Diane Earls advised that Robert Earls drove her to work on the morning of February 6, 2024, around 7:00 a.m. and they spoke on the phone around 10:00 a.m. but that he did not seem distressed. They had recently purchased a house in Oak Island, North Carolina, and were planning to move there. Their current house was listed for sale, and they had recently paid off the mortgage. She noted that Robert Earls had "regular debt." As detailed below, it does not appear that the mortgage had been paid off at the time this statement was made.

6. Diane Earls and Robert divorced in 2019, although they continued to live together at the PREMISES after the divorce. Robert's brother threatened to sue them in 2019, and they decided a divorce would help protect their assets from him. Diane Earls claimed to police that she had no idea why Robert Earls would harm himself. Salem police obtained the note that Robert Earls left.

It consisted of a file folder that had "more inside" written on the tab and handwriting on the outside that read:

> 2/6/24 Girls-I am so sorry
> Diane-Best Person Ever
> *[Redacted name]*-Best Grandson
> Brady-Best Friend Ever
> I love you all
> Please don't hate me
> I can't face you
> I am a coward
> May God have mercy on my soul
> Robert

7. The inside of the folder read:
    2/6/24 Jake's ashes are on the thing with my mirror and drawers.
    I can't have Brady but Allen will put Jake's ashes in with me.
    Please don't throw all my good stuff away. I love you all so much.

    2/6/24 This was not planned.
    *[First name of VICTIM 1]* made it have to happen yesterday afternoon.

8. There was also piece of paper with the following handwritten statement:
    Diane 2/6/24 *[Redacted name]* has file with instructions.
    Please forgive me.
    I can't do this any longer.
    I alone ruined an incredible family and life.
    Robert

9. On February 20, 2024, the FBI interviewed the individual whose name was redacted in the suicide note, hereinafter referred to as VICTIM 1. This individual advised that Robert Earls was an investment advisor for a large brokerage service (BROKER), through Earls' company, Southern Investment Strategies Inc. (SIS). In 2015, VICTIM 1 agreed to transfer a joint trust account containing approximately $1.2 million to the BROKER. VICTIM 1 and his sister (VICTIM 2) were the beneficiaries of this trust. In return, Robert Earls promised VICTIM 1 an eight percent referral, which VICTIM 1 never received. VICTIM 1 never made an issue of this with Robert Earls because he was a friend and VICTIM 1 trusted him. VICTIM 1 received statements in the mail from the BROKER for a time after the initial transfer but they eventually became sporadic. When VICTIM 1 inquired with Robert Earls about the account, Earls would show VICTIM 1 statements on the computer. Robert Earls provided VICTIM 1 with login information to get access directly with the BROKER but VICTIM 1 was never able to access his account. When VICTIM 1 questioned Robert Earls about this, Earls made a variety of excuses about system problems. On numerous occasions, Robert Earls met with VICTIM 1 at the PREMISES to discuss the account. VICTIM 1 also received periodic emails from Robert Earls about the account. During meetings at the PREMISES, Robert Earls would provide spreadsheets of VICTIM 1's account at the BROKER showing growth in the account rather than statements from the BROKER. Robert Earls told VICTIM 1 that Diane Earls, a Certified Public Accountant, had prepared the spreadsheets for VICTIM 1's account. When VICTIM 1 received statements from the BROKER, he noticed that they differed from the amounts Robert Earls was showing him in the spreadsheet. When VICTIM

1 asked about the discrepancies, Robert Earls would again provide a variety of reasons, claiming, for example, that some of the money was in a sweep account. VICTIM 1 also noted that Diane Earls appeared to be knowledgeable about the spreadsheets provided to him by Robert Earls. On occasion, VICTIM 1 or Robert Earls would have some question about the spreadsheets, and Diane Earls would come and answer the question.

10. In September 2023, VICTIM 1's sister (VICTIM 2) contacted Robert Earls to get a current statement on the joint trust account. Instead of a statement, Robert Earls sent an informational brochure, similar to a prospectus. After not getting a straight answer, VICTIM 2 hired a different financial advisor, who contacted the BROKER in early February 2024. VICTIM 2 was expecting a balance of approximately $2 million, however, the BROKER advised the account balance was $271. In addition, the BROKER indicated that the account was opened with approximately $244,000, not the $1.2 million that was withdrawn from the previous investment company in 2015. After VICTIM 2 notified VICTIM 1 of this discrepancy, VICTIM 1 contacted Robert Earls and demanded an explanation. Also, around early February 2024, VICTIM 1 wanted to do a partial withdrawal of his account at the BROKER. After repeated excuses, VICTIM 1 received a $5,500 transfer from Robert Earls, which appeared to come from Earls' personal account and not VICTIM 1's account at the BROKER. On February 5, 2024, Robert Earls advised that he was almost finished with the statements and VICTIM 1 replied that he was going directly to the BROKER at approximately 12:45 that day. After Diane Earls located the suicide note referencing VICTIM 1, she called VICTIM 1. VICTIM 1 began to explain the financial discrepancies to Diane Earls, who seemed surprised and said she was sorry before ending the call.

11. VICTIM 1 advised the FBI that Robert Earls paid for an expensive wedding for his daughter and has a $1 million house in Cape Cod. Lastly, VICTIM 1 noted that on or about February 11, 2024, VICTIM 1 and his wife saw Diane Earls taking papers out of Robert Earls' car and giving them to Diane Earls' daughter and son-in-law.

12. On April 18, 2024, the FBI interviewed Cooperating Witness 1 (CW1). CW 1 met Earls in approximately 2002. CW 1 referred several tax clients to Earls, and Earls would refer several of his investment clients to CW 1 for tax work. In 2020 or 2021, CW 1 noticed that VICTIM 1's trust had a large drop in taxable income. When CW 1 asked Earls about this, Earls replied that he had converted the investments to annuities, which satisfied CW 1. In hindsight, CW 1 noted that both Robert and Diane Earls were living well beyond their means. They frequently traveled to Boston to see their daughter and spent at least $100,000 on her wedding. They also took expensive trips to Nantucket for New Years Eve celebrations. CW 1 is certain that Diane Earls was involved in this scheme. Robert Earls would send CW 1 spreadsheets that Robert Earls said that Diane Earls had created. The spreadsheets were various client financial profiles that Robert Earls wanted CW 1 to review to see if they were understandable and reasonable. CW 1 does not believe that Robert Earls was technologically savvy enough to complete anything like the spreadsheets on his own. In addition, Diane Earls did a lot of the tax work for Robert Earls and sent CW 1 tax work she could not complete.

13. To date, 15 victims have been identified incurring an approximate total loss of $4.5 million. Interviews of several victims indicate a similar pattern of fraud related to investments with Earls Specifically, victims believed their investments were deposited into accounts at the BROKER. When the victims, to include VICTIM 4, VICTIM 8, VICTIM 10, among others, asked Earls to withdraw funds, they discovered major discrepancies in the balance of their accounts, or that no account existed in their name at the BROKER at all. Earls presented other victims, including

VICTIM 5 and VICTIM 6, with fraudulent spreadsheets and documents depicting growth to encourage victims to make further investments.

14. The FBI interviewed VICTIM 10 on May 16, 2024. VICTIM 10 has known Earls for approximately 38 years and rolled his employer retirement account worth about $140,000 into an IRA managed by Earls in 2014 or 2015. The account was supposed to go to the BROKER but VICTIM 10 never received any documents reflecting this. Rather, VICTIM 10 received notices from the IRS stating he owed approximately $22,000 in taxes for withdrawing the account instead of rolling it over. VICTIM 10 sent the notices to Earls who blamed it on the IRS's poor bookkeeping. Eventually, VICTIM 10 stopped getting notices and believes that Earls paid the tax liability with VICTIM 10's money. VICTIM 10 believed Robert and Diane Earls were living above their apparent means. He noted that Robert and Diane Earls would routinely travel to Boston to see their daughter and paid for an extravagant wedding for her. VICTIM 10 also believes that Earls helped pay for his other daughter's house in Oak Island, North Carolina. Robert Earls split up with Diane Earls in approximately 2019 after he dated various men for several years prior. Diane and Robert Earls both told VICTIM 10 that Earls had no assets in his name after signing them over to Diane. According to VICTIM 10, Robert Earls was not technically savvy and VICTIM 10 does not believe that Earls executed this scheme on his own. He believes that Diane Earls had (at least) knowledge of it.

15. Diane Earls was interviewed by the FBI at the PREMISES on February 22, 2024. In the interview, Diane Earls confirmed that she was an active Certified Public Accountant (CPA) and that Robert Earls was a financial advisor through the BROKER. According to Diane Earls, Robert Earls was not technologically savvy and had difficulty with computers. Robert Earls received periodic commission checks from the BROKER but Diane Earls was the primary breadwinner for the household. Diane and Robert Earls divorced because of Robert's brother, who Diane Earls described as mentally unstable. Most of their joint assets were signed over to Diane Earls in the divorce agreement, including the PREMISES, however the deed to the house remained in both of their names. They still lived together after the divorce. Robert Earls made the mortgage payments on the house. Diane Earls indicated that the PREMISES were under contract for sale after being listed in approximately June or July of 2023. After being advised that the FBI was looking into missing money that was being managed by Robert Earls, Diane Earls advised that she had no idea where the money went and noted that Robert always acted like he had no money. Diane Earls ended the interview shortly thereafter.

16. The FBI conducted a search of the PREMISES on March 5, 2024. Earls maintained an office space in the basement of the PREMISES. Additionally, the PREMISES was SIS's registered place of business. During the course of the search, several items were seized from Earls' basement office including records relating to VICTIM 1 and VICTIM 2, and several electronic devices, including a Dell laptop.

17. In addition, the FBI also located several handwritten pages, including a will, in Diane Earls' backpack, located at the PREMISES. Several of the pages reference this scheme including "A side note – I've been haunted by this day for years. Never thought it would be so soon. I'm out of my head (illegible) – See no other options. Sorry for all I've done to you." Another page states "Well everyone will know you were never involved, nor (their daughters) in any way." I believe that Earls included this verbiage to shield Diane Earls from her involvement in the scheme. When the FBI interviewed Diane Earls on February 22, 2024, she stated that she had no idea why Earls killed himself. In light of the documents found in her backpack, this statement appears to have been false.

18.     The FBI received records related to the PREMISES from Acquisition Title and Settlement Agency showing a sale price of $850,000, a loan payoff to Rushmore Loan Management for $102,835.66, and a second loan payoff to Truist Bank for $9,484.71. There is also a Post-nuptial Agreement dated December 8, 2017, in the loan package where Earls agrees to keep ten percent of the house and Diane Earls gets the remaining ninety percent. The agreement notes that there is an outstanding mortgage with "Mr. Copper" and a second mortgage with BB&T Bank.[1] There is also a section in the agreement where Diane Earls agrees to waive and relinquish all rights to Southern Investment Strategies, Inc. and that the business would be left to Earls' daughters upon his death. I believe one of the purposes of this agreement was to attempt to shield Diane Earls and her assets from criminal and/or civil liability related to the fraudulent scheme. Robert Earls' suicide note also stated that he leaves his 10% equity in the house to Diane Earls per the divorce decree.

19.     Analysis of Earls' bank records contains significant evidence of Robert Earls' criminal activity. A review of Earls' accounts revealed several checks deposited into Earls' personal accounts, including a MemberOne account, from victims who believed the funds would be invested. There is no evidence that Earls invested any of this money. Rather, the bank records show that Earls spent all the money the victims "invested" with him on a lavish lifestyle for himself, Diane Earls, his daughters, and other individuals. Earls routinely spent over $15,000 per month on his various credit card bills with most months being well in excess of this. He also spent a large amount of money on the mortgage payment on the residence he shared with Diane Earls.

20.     Earls primarily paid mortgage payments through Truist Bank for the PREMISES, including both his personal account and his SIS business account. On occasion, Diane Earls paid the mortgage; for example, in April 2020, Diane Earls paid the mortgage from her Hometrust Bank account.

21.     There are numerous examples of victim funds being used to pay the mortgage on the PREMISES. To take one example, on June 1, 2020, check 1014 in the amount of $45,000, signer VICTIM 1, was deposited into the SIS MemberOne business account. On the same day, Earls initiated a $5,000 transfer from the SIS MemberOne business account to Earls' personal account. On or about June 2, 2020, Earls paid Nation Star, doing business as (d/b/a) MR. COOPER, approximately $1,325.82 via wire for a mortgage loan.

22.     Additionally, on June 23, 2020, check 1026, in the amount of $45,000, signer VICTIM 1, was deposited into the SIS MemberOne business account. Also on June 23, 2020, Earls transferred $25,000 from the SIS business account into Earls' personal MemberOne account. The following day, July 24, 2020, Earls wired approximately $1,325.82 to Nation Star, d/b/a Mr. Cooper for a mortgage loan payment.

23.     On April 9, 2021, check 826, in the amount of $10,000, signer VICTIM 1, was deposited into the SIS MemberOne business account. On the same day, Earls initiated a $2,000 transfer from the SIS business account into Earls' personal MemberOne account. On April 16, 2021, Earls wired approximately $1,400 to Nation Star d/b/a Mr. Cooper for a mortgage loan payment.

---

[1] I know that "Mr. Cooper" is a well-known commercial mortgage company, and that BB&T merged in 2019 with SunTrust to form Truist Bank.

24. From 2015 to February 2024, Earls made a total of $190,598.38 in mortgage payments on the PREMISES. During each of these years, Earls was spending far more than he was making from the BROKER or from legitimate business through SIS or by other legitimate means. Given these facts, and the scale of Earls's fraud, I believe that Earls's mortgage payments represent, or are derived from, proceeds of wire fraud and wire fraud conspiracy.

25. It is also the case that the equity gained in the PREMISES by mortgage payments during this period appreciated in value due to market factors. Review of public tax rolls shows significant appreciation in assessed values in Roanoke County year over year. According to open source publicly available data, the tax value of the PREMISES in 2015 was approximately $473,200. By 2023, the assessed tax value of the PREMISES was approximately $595,600.

26. Earls appears to have engaged in promotional money laundering, in violation of 18 U.S.C. § 1956. For example, Earls utilized stolen client funds to tender funds to other clients, maintaining the scheme by keeping clients unaware that their funds were being spent. To take one example, on April 9, 2021, check number 826, in the amount of $10,000, signer VICTIM 1, was deposited into the SIS Member One business account. On the same day, check number 887064, in the amount of $2,000 was tendered to VICTIM 8.

27. On April 26, 2022, check 964, in the amount of $20,000, signer VICTIM 1, was deposited into the SIS MemberOne business account. On April 27, 2022, Earls transferred $1,000 from the SIS MemberOne business account to Earls' personal account. On May 19, 2022, check 5062, in the amount of $1,000, drawn on Earls' personal account, was paid out to VICTIM 16.

28. My investigation indicates that Diane Earls was aware that Robert Earls was engaged in fraud, and in fact participated in the fraud.

29. A preliminary review of Earls' finances also revealed Diane and Robert Earls shared an American Express account. Review of the account indicates large personal expenditures funded by victim funds intended for "investments." Specifically, on May 16, 2022, check number 10220, in the amount of $20,000, was received from VICTIM 15 and deposited into the SIS MemberOne Account. On May 17, 2022, seven wire transactions totaling $4,135.09 were made payable to American Express. The payment settled 10 transactions totaling $1,800.14, for American Express card number 3-12012, titled to Diane Earls. Transactions included merchant purchases at Macy's, Belk, American Airlines, and Kroger.

30. Further review of the Earls' American Express account indicated on September 13, 2022, Truist Bank account 3229, titled to SIS, received check number 831 from VICTIM 1 in the amount of $23,000. On September 15, 2022, four transactions totaling $4,313.86 were settled to American Express. The above payment settled American Express transactions pertaining to credit card number 3-12012, titled to Diane Earls. Specifically, there were ten transactions in the amount of $824.94, including purchases at McDonalds, Wayfair, Kroger, and Sheetz.

31. On April 26, 2022, the MemberOne account titled to SIS received check number 964 for deposit from VICTIM 1 in the amount of $20,000. On April 27, 2022, six transactions totaling $9,000 were made payable to the American Express account jointly held by the Earls. Specifically, the payment settled personal expenditures on card 3-12012, titled to Diane Earls and American Express card 3-13002, titled to Robert Earls.

6

32.     Additional notable expenditures made by Robert Earls that Diane Earls would have knowledge of include: approximately $278K in house payments, approximately $30K for their daughter's December 31, 2019 wedding, and approximately $34K in utilities.

33.     In addition, Diane Earls is likely to be aware of Robert Earls' extravagant lifestyle which included approximately $668K in cash withdrawals, approximately $151K in dining, and approximately $627K in retail spending from 2014 through 2023.

34.     Robert Earls' spending greatly surpassed the income he was receiving from BROKER. In 2017, the excess spending over income was $669K, in 2018 it was $498K, and in 2019 it was $444K. Robert Earls had a minimal Virginia Adjusted Gross Income from 2017 through 2023 with no income or losses in 2017, 2018, 2019, 2020, and 2023. Diane Earls is a Certified Public Accountant who did Robert Earl's bookkeeping and also was deeply involved in the filing of Robert Earls' tax returns as detailed in emails, text messages and interview of CW1. As such, she saw how much he was spending on their joint expenses and his lifestyle and how much he was earning from BROKER.  She even made a comment in a January 21, 2021 text message to Earls that he only made $10,809 in 2018.

35.     Additional review of Diane Earls' text messages were conducted pursuant to the seizure of Diane Earls' cellular phone during the search of her residence.  There is significant evidence of Diane Earls' knowledge of and involvement in this scheme as summarized below:

**Text messages between Robert Earls and Diane Earls**

01/10/2021
DE: Questions on [VICTIM 11]. When did you run the annuity to start. And does it really pay 50,000 a year forever.
DE: Did you see the above tect (sic)
DE: Text
RE: Call me

1/21/2021
DE: You only made $10,809 in 2018 from [BROKER]

06/25/2021
DE: Remember you need to do withdrawal/transfer/deposit for [VICTIM 11's wife].

01/12/2022
DE: Are the [VICTIMS 5 and 6] tomorrow?
RE: Yeah
DE: Time
RE: 4

06/28/2022
[Screenshot of joke about a broker losing money for his clients]
RE: Boooo
DE: Shouldn't you send to [VICTIM 11]
DE: or [VICTIM 14]

      01/24/2023
      DE: Can you send me s pdf of your letterheaf
      DE: Head

      07/20/2023
      RE: Make sure I'm up by 7 And headed to [VICTIM 14]
      DE: Dont forget you need the check. You need to walk me thru it.
      RE: [Checkmark]

      10/15/2023
      DE: [VICTIM 1's wife] got the checks
      RE: OK

      11/17/2023
      DE: So you want me to update Jan 2021 ss to 2023 numbers
      DE: [Picture of spreadsheet entitled [VICTIM 1 and 2's Trust as of 11/17/23]
      DE: [Another picture of a spreadsheet of VICTIM 1 and 2's Trust]
      DE: Did you look at picture

36.    Further review of Diane Earls' phone revealed numerous documents referencing several victims, including Excel spreadsheets pertaining to VICTIM 1 and documents referencing SIS.

37.    Additional review of Diane Earls' phone revealed numerous searches conducted on February 7, 2024, for the following:

- Lewis Gale Psychiatric Hospital in Salem, Virginia

- Missing man Salem, VA

- When can ex spouse collect social security (It appears that this search was conducted approximately five hours before law enforcement notified Diane Earls of Robert Earls' suicide on February 7, 2024)

- Pinnacle scrossroads (sic, Robert Earls banked at Pinnacle)

- Roanoke city jail iates (sic)

38.    The following additional searches were conducted by Diane Earls:

- February 10, 2024, multiple searches were conducted for "can you hear old conversations from alexa" and "prior conversations alexa may have heard"

- February 11, 2024, multiple searches were conducted for "jointly owned house at death of one owner" and "*[BROKER]* broker steals clients money"

- February 20, 2024, multiple searches were conducted for "does jointly owned property go into estate subject to debtors"

8

- February 22, 2024, multiple searches were conducted for "innicent spouse embezzling" and "wmbezzling joint property." (NOTE: the FBI interviewed Diane Earls on February 22, 2024).

39. In addition to sites related to the above searches, a review of Diane Earls' phone indicates Diane Earls' web history included the following queries:

- February 23, 2024: "Why was ruth madoff stripped of assets" and "what happened to dpoude in ponzi scheme"

- February 22, 2024: visited multiple Internet articles about embezzlement

40. The FBI conducted an examination of the data from Diane Earls' email accounts dmearls@ymail.com and 2dianeearls@gmail.com. There is significant evidence of Diane Earls' knowledge of and involvement in this scheme. Specifically, on January 2, 2021, Diane Earls sent Robert Earls an email with attachment referencing VICTIM 11. The attachment's header referenced VICTIM 11 (and spouse), 1st Quarter 2019, with 1st crossed out and 2nd handwritten under it. The attachment appears to be a document containing investments for VICTIM 11 and spouse and details shares, price per share, and approximate value. The document details figures related to VICTIM 11's purported investments.

41. The examination also revealed numerous emails noting that Diane Earls was Facebook friends with several victims. Additionally, several emails to and from Robert Earls containing spreadsheets for victims were also found, including an email from Diane Earls to Robert Earls on January 2, 2021 with several handwritten changes. The handwriting unit at the FBI Laboratory was unable to determine whose handwriting it was.

42. The following additional emails were found during the review:

- Emails to and from Robert Earls about the operation of SIS including job duties for employees, emails from Robert Earls with spreadsheets of his business expenses, a business continuity plan, and emails regarding a PPP loan for SIS.

- An email dated September 12, 2022, from CW1 to Diane Earls entitled W-2. The email has a comment from CW1 "Which one of us gets to kill him first." There is an attachment on the email of a W-2 for Robert Earls showing 2021 Wages of $15,000.

- An email dated October 31, 2022 from CW1 to Diane Earls entitled 3rd quarter reports. The email has a comment from CW1 "better to send you than Robert." There is an attachment on the email of a 2022 Form 941 for SIS.

- An email dated September 1, 2021, from Robert Earls to Diane Earls forwarding a 1099 that CW1 had previously sent to Robert Earls.

- Emails documenting Diane Earls receiving Continuing Professional Education to maintain her CPA license.

43. The information detailed above indicates that Diane Earls participated in a wire fraud conspiracy with Robert Earls, and that she aided and abetted Earls's wire fraud, specifically by

9

creating knowingly false spreadsheets with fictitious information to lull clients into the continued belief that their funds were being invested. Diane Earls also answered questions about the content of the spreadsheets, further legitimizing the fraud.

44. Diane Earls was also necessarily aware that Robert Earls was engaged in fraud and that he made mortgage payments on the PREMISES for years utilizing the fruits and proceeds of fraud.

45. In May 2024, after Robert Earls's death, Diane Earls listed the PREMISES for sale and entered into a contract to sell the property. The listed sellers were Diane Earls and the estate of Robert Earls (with Diane Earls as executrix). The sale price of the house was $850,000.

46. The real estate closing occurred by and through Acquisition Title and Settlement Agency. In order to complete the transaction, Diane Earls caused Acquisition Title to disburse funds from the sale to pay off multiple parties, including (1) $25,000 to the listing agent; (2) $25,000 to the selling agent; (3) $102,835.66 to Rushmore Loan Management, a financial institution servicing a mortgage loan for the PREMISES; and (4) $9,484.71 to Truist Bank to pay off another mortgage on the PREMISES.

47. The real estate sale closed on June 5, 2024. On the day of the closing, the FBI seized two checks pursuant to a forfeiture seizure warrant signed on June 3, 2024. Check # 97394 in the amount of $61,668.98, represented Diane Earls's share of the house sale; check # 97393, in the amount of $66,852.11, represented a 10% share held by Robert Earls's estate.

48. The FBI subsequently seized an additional check for $4,061.72, representing a refund of property taxes paid on the PREMISES.

49. The three checks, totaling $672,582.81, were subsequently deposited in the Seized Asset Deposit Fund.

50. These funds, the SALE PROCEEDS, are the property to be forfeited.

51. Based on the foregoing information, the SALE PROCEEDS are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and/or (C).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of August, 2025

_____
Megan Effing
Special Agent
Federal Bureau of Investigation